IN THE UNITED STATES DISTRICT FOR
THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| CONNOR ELLIOTT and AMANDA ELLIOTT, individually and as next friend of N.E., their child and a minor, | § § § § § | |
| Plaintiffs | § § | |
| vs. | § § | No. 1:19-cv-427 |
| UNITED STATES OF AMERICA, | § § | |
| Defendant | § § | |

## ORIGINAL COMPLAINT

Plaintiffs CONNOR ELLIOTT and AMANDA ELLIOTT, individually and as Next Friend of N.E., their child and a minor, bring this complaint under the Federal Tort Claims Act, 28 U.S.C. § 2674. Plaintiffs complain of the United States of America and would show the following:

## PARTIES

1.1.    This case arises out of medical malpractice caused by United States Army employees in the care and treatment of Amanda Elliott and her child, N.E.

1.2.    Plaintiffs are Connor Elliott and Amanda Elliott, individually and as Next Friend of N.E., their minor child. They reside in the City of Ludlow, State of Kentucky.

1.3.    At the time of the events giving rise to this lawsuit, Plaintiffs lived on the Fort Hood military base in Fort Hood, Texas.

1.4.    Defendant is the United States of America.

## JURISDICTION, SERVICE, & VENUE

2.1.    This Federal District Court has federal-question jurisdiction because this action is brought pursuant to and in compliance with 28 U.S.C. §§ 1346(b), 2671–2680, commonly known as the Federal Tort Claims Act.

2.2.    The United States of America may be served with process in accordance with Rule 4(i) of the Federal Rules of Civil Procedure by serving a copy of the Summons and Complaint on the United States Attorney John F. Bash, United States Attorney for the Western District of Texas by certified mail, return receipt requested at his office:

> United States Attorney's Office
> ATTN: Civil Process Clerk
> 601 NW Loop 410, Suite 600
> San Antonio, Texas 78216

2.3.    Service is also affected by serving a copy of the Summons and Complaint on William P. Barr, Attorney General of the United States, by certified mail, return receipt requested at:

The Attorney General's Office
ATTN: Civil Process Clerk
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

2.4.    Venue is proper in this district under 28 U.S.C. § 1391(e)

because the United States is the Defendant, and a substantial part of the

events or omissions giving rise to the claim occurred in this district.

## LIABILITY OF THE UNITED STATES

3.1.    Plaintiffs complain of United States of America pursuant to and

in compliance with Title 28 U.S.C. §§ 2671–2680, the Federal Tort Claims

Act. Liability of the United States is predicated specifically on 28 U.S.C.

§ 2674 because the personal injuries and resulting damages of which the

complaint is made were proximately caused by the negligence, wrongful acts

or omissions of employees or agents of the United States of America working

for the United States Department of the Army, while acting within the scope

of their office, employment, or agency under circumstances where the United

States of America, if a private person, would be liable to the Plaintiffs in the

same manner and to the same extent as a private individual.

3.2.    The United States Department of Army is an agency of the

United States of America.  The Defendant United States of America, through

its agency, the United States Department of Army, at all material times

owned, operated, and controlled Carl R. Darnall Army Medical Center and

staffed its facilities and vehicles with its agents, servants, and employees.

3

3.3.    At all material times, the individuals providing medical care to Amanda Elliott and N.E. were agents, servants, or employees of the United States of America or its agency and were acting within the course and scope of their employment.

## JURISDICTIONAL PREREQUISITES

4.1.    Pursuant to 28 U.S.C. §§ 2672 and 2675(a), Plaintiffs delivered the claims that form the basis of this lawsuit to the U.S. Army Claims Service in a Notice dated October 2, 2017. The Department of the Army acknowledged receipt of the Notice in a letter dated November 2, 2017 stating that the Army had received the claims on October 5, 2017.

4.2.    The United States Department of Army made no final disposition of the claim. Plaintiffs filed this lawsuit greater than six (6) months after the administrative presentation of their claims.

4.3.    Accordingly, Plaintiffs have complied with all jurisdictional prerequisites and conditions precedent to the commencement and prosecution of this suit.

## FACTS

5.1.    At all times material to this lawsuit, Plaintiffs Amanda Elliott and her child N.E. were patients of Carl R. Darnall Army Medical Center ("Darnall") and its medical providers. They had a doctor-patient relationship with the medical providers at Darnall.

5.2.    Amanda Elliott and Connor Elliott are married. At age 21, Amanda Elliott became pregnant with N.E. She was expected to deliver N.E. on December 14, 2015. The medical providers at Darnall knew her obstetrical history though its electronic medical records system. Specifically, they knew that she had type II diabetes.

5.3.    On July 13, 2015, Darnall providers gave Ms. Elliott a glucose test, which revealed high glucose. This test checks Ms. Elliott for gestational diabetes. Gestational diabetes creates a high-risk pregnancy for mom and baby.

5.4.    On July 14, 2015, Darnall providers saw Ms. Elliott for an obstetrical appointment. Ms. Elliott informed providers that her home measurements of her blood sugar levels were normal.

5.5.    Darnall providers again saw Ms. Elliott July 20, 2015. Ms. Elliott again informed providers that her home measurements were normal, except for one elevated measurement after eating ice cream. Providers discussed her diabetic history and the effects of elevated glucoses on her baby.

5.6.    On August 12, 2015, Ms. Elliott brought to Darnall her blood-sugar log. Darnall records reflect that the log showed multiple abnormal values. Darnall providers noted that Ms. Elliott seemed to be improving her diet and knew the importance of maintaining her blood-sugar levels.

5.7.    On September 4, 2015, Darnall providers changed Ms. Elliott's medication to better control blood-sugar levels. They discussed with Ms. Elliott the long-term effects of uncontrolled diabetes.

5.8.    On a September 18, 2015 obstetrical visit, Darnall providers noted that Ms. Elliott may need insulin and requested a consult with a maternal-fetal medicine specialist.

5.9.    On October 7, 2015, providers noted that antepartum fetal testing should begin at 32 weeks and Darnall obstetrics should induce labor at 39 weeks. Darnall providers scheduled a nutrition consult to discuss diet modifications.

5.10.   Darnall medical providers gave Ms. Elliott her first antepartum fetal test on October 26, 2015. They informed her that the results were reassuring.

5.11.   On October 29, 2015, Darnall providers performed a fetal biophysical profile to check the baby's wellbeing. Their test scored an eight (8) of eight (8), which reassured them.

5.12.   On November 2, 2015, Darnall providers noticed improvement in Ms. Elliott's blood-sugar levels. They discussed the need for consistent control and Ms. Elliott told them she will try to adhere to her diet more strictly.

5.13.   Darnall antepartum testing provided reassuring results on November 2nd, 5th, 9th, 12th, and 16th.

5.14.   On November 17, 2015, Darnall providers noted that Ms. Elliott did well with glucose testing. Because lunch and dinner elevated her blood-sugar levels, Darnall providers decided to increase Ms. Elliott's medications.

5.15.   On November 19, 2015, Darnall providers reviewed antepartum test results and described them as reassuring. A biophysical profile scored ten (10) of ten (10).

5.16.   Again, on November 23, 2015, a Darnell clinic provider described antepartum testing as "reassuring but not reactive with periods of tachycardia." But the baseline was between 155-160 beats per minute. At this point, Ms. Elliott and her baby were medically stable and capable of receiving medical treatment as a nonemergency patient. So, Darnall providers sent her to labor and delivery for prolonged monitoring.

5.17.   Ms. Elliott presented to the Darnall obstetrics' department around 1308 from the clinic. Darnall providers noted mildly elevated blood pressure between 1315 and 1500.

5.18.   At 1559, providers admitted Ms. Elliott for hypertension. They noted that fetal heart tones remained tachycardic without 15×15 accelerations, despite IV hydration. However, the baseline was between 150-160 beats per minute. At 1700, they also checked Ms. Elliott's blood pressure and found it elevated. During this time, the strip showed minimal to moderate long-term variability with occasional variable decelerations. And it was appropriate for Darnall providers to continue to monitor mom and baby.

5.19.   Darnall providers performed a cervical exam at 1715. Their exam found Ms. Elliott four (4) centimeters dilated and 80% effaced, and the baby was at -2 station. The obstetricians decided to augment Ms. Elliott's labor using the drug Pitocin.

5.20.   The drug Pitocin causes the body to increase the frequency, strength, and length of contractions. Medical providers use Pitocin to induce labor and hasten delivery. Too much Pitocin causes uterine hyperstimulation or excessive uterine activity. Uterine hyperstimulation can deprive baby of oxygenated blood (the baby's only source of oxygen in the womb).

5.21.   Darnall obstetricians noted the reason for Pitocin augmentation as pre-eclampsia and category II fetal heart tones, with fetal tachycardia and a non-reactive strip.

5.22.   At 1750, Darnall providers artificially ruptured Ms. Elliott's membranes. They noted that the fetal heart rate baseline was 165 and moderate variability was present. Providers also noted accelerations were absent, decelerations were present and variable. Ms. Elliott continued to have contractions every three (3) to five (5) minutes. At this point, mom and baby were medically stable. Thus, Darnall providers appropriately planned to continue observation and did not initiate any emergency protocol.

5.23.   Between 1800 and 2000, Darnall providers recorded Ms. Elliott's blood pressure as elevated.

5.24.   At 2348, a cervical exam showed Ms. Elliott to be eight (8) centimeters dilated and 95% effaced, and the baby was at +1 station. Between 2300 and 2400, baby N.E.'s fetal monitoring should have generally reassured providers.

5.25.   On November 24, 2015, at 0000, Ms. Elliott requested an epidural. At 0116, 0117, 0120, 0136, and 0149, Darnall providers took elevated blood pressure readings from Ms. Elliott.

5.26.   Between 0000 and 0730, baby N.E.'s strip began with moderate variability but then starts to show troubling signs of fetal distress. From 0000 to 0145, the strip demonstrated occasional variable decelerations, occasional late decelerations, and intermittent excessive uterine activity.

5.27.   Beginning at 0200, baby N.E. experiences a sudden rise in the baseline heartrate from 140 beats per minute to about 160 beats per minute.

5.28.   From 0230, the baby experiences prolonged variable decelerations and no accelerations in conjunction with a change from moderate to absent variability.

5.29.   From 0240 to 0310, baby N.E. continues to experience minimal variability, variable decelerations, and no accelerations.

5.30.   Without explanation, the fetal monitor fails to document heartrate and contractions from 0336 to 0350.

5.31.   At 0350, when the strip is reattached, the strip shows an immediate late deceleration, minimal variability, and no accelerations. This continues through 0420.

5.32.   From 0450 to 0505, the strip shows late and variable decelerations with no accelerations. From 0550 to 0720, the baby experiences bouts of minimal variability, late decelerations, variable decelerations, and prolonged decelerations.

5.33.   At 0720 to 0730, N.E.'s monitoring showed minimal variability and continued late decelerations.

5.34.   From 0720 to 0820, the fetal strip showed variable, late, and prolonged decelerations in the setting of minimal to absent variability.

5.35.   At 0820, a cervical exam showed that Ms. Elliott was ten (10) centimeters dilated and 100% effaced, and the baby was at +1 station. Yet, the delivery summary did not show Ms. Elliott completely dilated until 0940. A Darnall obstetrics resident noted that Ms. Elliott lacked the urge to push.

5.36.   A 0940 cervical exam noted that Ms. Elliott was ten (10) centimeters dilated, 100% effaced, and baby N.E. was at +2 station. The notes described fetal heart tones with accelerations, but without decelerations. Even though Ms. Elliott lacked the urge to push, Darnell providers asked Ms. Elliott to push at 0946. Providers also started Pitocin.

5.37.   In contrast to the notes, from 0950 to 1100, the fetal heart rate increased to a baseline in the 170s,which is tachycardic, and the strip

demonstrated late and variable decelerations with minimal variability. By 1030, a cervical exam showed baby still at +2 station. And at 1111, obstetrics providers noted a new fever. Still, they ordered Ms. Elliott to continue pushing.

5.38.   At 1111, the baseline heart rate increased to the 180s. The strip shows repetitive late decelerations. Mom is contracting every thirty seconds to three minutes. And despite the presence of a prolonged non-reassuring strip, Darnall providers increased Pitocin dosage.

5.39.   By noon, the baby's heartrate experienced persistent late decelerations, its baseline increased to the 190s with absent to minimal variability, and there is less than thirty (30) seconds between mom's contractions. Baby N.E. is experiencing the effects of uterine hyperactivity or hyperstimulation. N.E. does not have enough time between these contractions to receive oxygenated blood.

5.40.   From 1250 to delivery, the strip intermittently loses the fetal heartrate. Had providers attached a fetal scalp electrode, they could have avoided this result. Because of the intermittent loss of signal, one cannot determine the periodic changes (if any) to the fetal heart rate.

5.41.   Darnall providers called the neonatal intensive care unit (NICU) team at 1308, and they arrived two minutes later.

5.42.   Darnall providers delivered N.E.'s head at 1317. They performed the McRoberts maneuver and suprapubic pressure. They delivered N.E.'s body at 1318.

5.43.   Providers measured arterial cord gas as having a pH of 6.83 and a base excess of -20.5. Venus cord gas had a pH of 7.04 and a base excess of -17.8.

5.44.   Baby N.E.'s APGAR scores were 0, 4, and 8. At delivery, Darnall providers observed N.E. to be blue with no tone or respirations. They instituted advanced resuscitation measures. They started positive pressure ventilation (PPV—21%) at 20 seconds of life. The baby's heartrate was less than 60 beats per minute, so chest compressions were started at 30 seconds of life.

5.45.   At 1322, N.E. began spontaneous respirations. $SpO_2$ was 75%. At 5 minutes of life, $FiO_2$ was increased to 50%. Providers continued PPV after adjusting neck and CPAP mask. Within 2 minutes of doing PPV, saturations improved >95% on FiO2 1.00 and HR was 210. At 13:28 it was noted that by 10 minutes of life HR started to decrease to the 160–170's and saturations remained >95%. By about 7 minutes of life he had respiratory effort and was switched to CPAP.

5.46.   At 1521, the NICU admission assessment showed N.E. as lethargic with head molding. N.E.'s glucose tests showed 46 at 1359; 13 at 1540; and less than 10 at 1553.

5.47.   The NICU admission report described N.E. as alert, active, with good tone but with improving tone on right upper extremity, right facial droops, and with eyes wide open looking around. Given the cord gasses and concern for a possible neurologic insult, providers transferred N.E. to Baylor Scott & White McLane Children's Hospital for monitoring and possible cooling therapy.

5.48.   At Baylor, they started cooling therapy for N.E. at 1815. The Baylor NICU admission record describes N.E. to have generalized dependent scalp edema, worse on left side, slightly fluctuant, and bruising to face, right ear and scalp. They were concerned for a possible subgaleal hemorrhage.

5.49.   The next day, November 25, 2015, Baylor performed a cranial ultrasound, which they interpreted as normal.

5.50.   On November 26, 2015, Baylor gave N.E. an electroencephalogram (ECG), which they interpreted as abnormal with findings consistent with moderate to severe encephalopathy and which put N.E. at high risk for seizures.

5.51.   Another ECG taken on November 27, 2015 also showed abnormalities in N.E.'s brain.

5.52.   On November 28, 2015, Baylor records indicate a diagnosis of hypoxic-ischemic encephalopathy (HIE), with seizure activity presenting as apnea episodes. Providers intubated N.E. for multiple apneic spells.

5.53.   On November 30, 2015, Baylor took an MRI of N.E.'s brain. It showed multiple sites of intracranial hemorrhage including small areas of intraparenchymal hemorrhage noted in the right frontal subcortical white matter and bilateral periventricular regions. Both lateral ventricles contained intraventricular hemorrhages. The MRI showed a subarachnoid hemorrhage along the cerebral convexities and within the cisterna magna. The lateral ventricles were prominent and there was soft tissue swelling within the subcutaneous tissue of the posterior parietal scalp.

5.54.   Another ECG performed on November 29, 2015 showed abnormalities in N.E.'s brain.

5.55.   Because N.E. could not swallow without choking or aspirating, providers placed a G-tube on December 19, 2015.

5.56.   Finally, on December 24, 2015, providers discharged N.E. home. They diagnosed him with HIE, intraventricular hemorrhage in a newborn, slow feeding in a newborn, feeding difficulty in a newborn due to oral motor dysfunction, and hydrocele in a newborn.

## CAUSE OF ACTION

6.1.   Through its employees, agents, or servants, the Defendant, United States of America, was negligent in one or more of the following respects by failing to:

6.1.1.    recognize a patient as a high-risk obstetrical patient in the presence of elevated blood pressures, hypertension, pre-eclampsia, and diabetes in the prenatal period;

6.1.2.    timely and appropriately send patient to the hospital for further evaluation and observation in the presence of non-reassuring antenatal testing in the prenatal period;

6.1.3.    timely and appropriately consult with a physician when managing a high-risk patient in the prenatal period;

6.1.4.    timely and appropriately recognize and act on fetal heart rate patterns, including tachycardia in the prenatal period;

6.1.5.    timely and appropriately send the patient for further antenatal testing in the presence of non-reassuring testing in the prenatal period;

6.1.6.    appropriately communicate/consult with health care personnel including but not limited to an obstetrician and/or maternal fetal medicine doctor in the prenatal period;

6.1.7.    appropriately utilize the chain of command in the prenatal period, during labor and delivery, and in the neonatal period;

6.1.8.    appropriately function as a team in the prenatal period, during labor and delivery, and in the neonatal period;

6.1.9.    timely and appropriately provide care to avoid prolonged labor during labor and delivery and thus reduce, eliminate, or avoid excessive fetal head compression, scalp molding or caput, as well as infection, perinatal hypoxia, ischemia, and encephalopathy;

6.1.10.   appropriately use and monitor use of Pitocin to mom causing excessive uterine activity;

6.1.11.    timely and appropriately recognize and advocate for action on fetal heart rate patterns during labor and delivery, which include a rising baseline, diminished variability, late decelerations, and variable decelerations;

6.1.12.    appropriately advocate for assessment, evaluation, monitoring and performance of a timely delivery during labor and delivery;

6.1.13.    timely and appropriately recognize and advocate for action during labor and delivery on the failure to progress during labor;

6.1.14.    timely and appropriately recognize and advocate for action on Cephalopelvic Disproportion during labor and delivery;

6.1.15.    timely provide for a C-section during labor and delivery in the presence of pre-eclampsia, fever, fetal intolerance to labor as evidenced in the fetal monitor strips, and prolonged labor;

6.1.16.    advocate during labor and delivery to ensure that a timely C-section is performed;

6.1.17.    appropriately communicate/consult with health care personnel during the prenatal period, labor and delivery, and neonatal period, including but not limited to an obstetrician and/or maternal fetal medicine doctor;

6.1.18.    failure during the neonatal period to have cooling equipment available at the delivery of N.E.; and

6.1.19.    failure during the neonatal period to timely and appropriately institute cooling therapy once baby N.E. was delivered.

6.2.    At all material times, the employees, agents, or representatives of the United States Government were negligent and proximately caused the injuries sustained by Plaintiffs.

6.3.    The Government's negligence caused N.E.'s traumatic delivery. Fetal monitoring showed multiple instances over hours where providers could have intervened and prevented N.E.'s traumatic delivery. These insults to N.E. were neither sudden nor unforeseeable. Government medical providers had multiple opportunities to intervene and prevent these insults from occurring. Yet, for hours to days, multiple Government providers negligently failed to intervene. As the hours passed, this systemic negligence slowly deprived N.E. of oxygenated blood in the womb (his only source of oxygen), until his fetal reserves dried up and he suffered a permanent neurologic insult.

6.4.    Because of the Government's negligence, N.E. suffered hypoxia, ischemia, asphyxia, cellular and tissue damage arising before delivery and continuing after birth. These insults caused developmental delays, brain damage, cerebral palsy, spasticity, dystonia, hypotonia, intracranial hemorrhage, feeding difficulties, and microcephaly.

6.5.    The Government's negligence permanently disabled N.E. He has suffered more pain than any child should endure, and will continue to experience pain, suffering, and disability throughout his life. The Government's negligence deprived N.E. of a meaningful earning capacity and the ability to enjoy the normal activities of daily living. He requires past and future hospital, medical, and attendant supportive care. He requires lifelong

physical, occupational, speech, and other forms of therapy. He requires lifelong attendant supportive care and will never live an independent life.

## DAMAGES

7.1.    As a proximate result of the Defendant's negligent acts or omissions, Plaintiffs suffered injuries, which would not have occurred otherwise. AMANDA and CONNOR ELLIOT, on behalf and as Next Friends of  N.E., pleads for all damages available under Texas state law, federal law, and equity, including:

      7.1.1.    Past and future physical pain and mental anguish;

      7.1.2.    Complete loss of earning capacity;

      7.1.3.    Past and future disfigurement;

      7.1.4.    Past and future physical impairment;

      7.1.5.    Past and future medical, attendant services, therapy, and other care expenses; and

      7.1.6.    All other pecuniary damages owed to him.

7.2.    AMANDA and CONNOR ELLIOT, both individually, plead for all damages available under Texas state, federal law, and equity, including:

      7.2.1.    Past and future medical, attendant services, therapy, and other care services provided to N.E. until he reaches age 18;

      7.2.2.    Past and future mental anguish;

      7.2.3.    Past out-of-pocket expenses;

      7.2.4.    Past and future companionship, services, and society with N.E.; and

    7.2.5.   Past and future loss of services of N.E. until he reaches age 18;

  7.3. Plaintiffs, AMANDA and CONNOR ELLIOT, individually and on behalf of N.E., plead for all other damages, pecuniary or otherwise, arising out of law or equity, that they may be justly and equitably entitled to, in the wisdom of the Court.

## PRAYER

  Plaintiffs request that Defendant be cited in terms of law to appear and answer this Complaint; that upon final trial, the Plaintiffs have judgment against Defendant, for the amount of actual damages and for other and different amounts as they shall show by proper amendment before trial; for post-judgment interest at the applicable legal rate; for all Court costs incurred in this litigation; and for such other relief, at law and in equity, both general and special, to which Plaintiffs may show themselves entitled to and to which the Court believes them deserving.

    Respectfully Submitted,

    /s/ *Euel W. Kinsey*
    EUEL W. KINSEY
    ekinsey@abclawcenters.com
    Texas State Bar #24001244
    JESSE M. REITER, *pending pro hac vice*
    jreiter@abclawcenters.com
    Michigan State Bar #P40692
    REITER & WALSH, P.C.
    122 Concord Road
    Bloomfield Hills, MI 48304
    (248) 593-5100 (o)
    (248) 593-5108 (f)

JAMAL K. ALSAFFAR
jalsaffar@nationaltriallaw.com
Texas State Bar #24027193
TOM JACOB
tjacob@nationaltriallaw.com
Texas State Bar #24069981
WHITEHURST, HARKNESS, BREES, CHENG,
ALSAFFAR, HIGGINBOTHAM, & JACOB PLLC
7500 Rialto Blvd, Bldg Two, Ste 250
Austin, TX 78735
(512) 476-4346 (o)
(512) 467-4400 (f)

Attorneys for the Plaintiffs